IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2013 JUN -4  AM 9: 18

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

KB PARTNERS I, L.P., individually and on behalf
of all others similarly situated,
                       **Plaintiff,**

-vs-
                                                       **Case No.  A-11-CA-1034-SS**

REMI BARBIER, PAIN THERAPEUTICS, INC.,
NADAV FRIEDMANN, and PETER RODDY,
                       **Defendants.**

---

## O R D E R

       BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically the parties' Joint Motion to Extend Time and Page Limits [#80]; the parties' Joint Motion to Extend Time [#85]; Plaintiff KB Partners I, L.P.'s Motion for Class Certification [#83] and Memorandum in Support [#84], Defendants Pain Therapeutics, Inc., Remi Barbier, Nadav Friedmann, and Peter Roddy (collectively, PTI)'s Response [#103], KB Partners' Motion for Leave to File Sealed Document (Reply) [#110], and KB Partners' Declaration in Support [#111]; KB Partners' "Unopposed" Motion to File Corrected Memorandum of Law in Support of Motion for Class Certification [#87], PTI's Response [#88], PTI's Memorandum in Opposition [#100], and KB Partners' Reply [#101]; and PTI's Motion to Exclude Declaration of Frank C. Torchio [#89], PTI's Declarations in Support [##91, 92], KB Partners' Response [#105], KB Partners' Original [#106] and Amended Rebuttal Declaration of Frank C. Torchio [#107], and PTI's Reply [#108]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.



## Background

This is a putative class action securities-fraud suit centering around PTI's failed efforts to obtain FDA approval for its flagship prescription painkiller REMOXY. The Court has previously recounted the facts giving rise to this suit in considerable detail on two occasions. *See* Order of Sept. 26, 2012 [#68], at 1–5 (order granting first motion to dismiss); Order of Nov. 20, 2012 [#75], at 1–3 (order denying second motion to dismiss). In short, KB Partners alleges PTI misled the investing public to drive up the price of PTI stock, some shares of which were ultimately purchased by KB Partners. When the FDA refused to approve REMOXY, and PTI's misrepresentations were subsequently exposed, the stock price plummeted and investors paid the price. KB Partners now seeks to certify a class, and the dozen motions recounted above address the issue.

## Analysis

### I.    Procedural Motions

As an initial matter, the following procedural motions are GRANTED: the parties' Joint Motion to Extend Time and Page Limits [#80]; the parties' Joint Motion to Extend Time [#85]; and KB Partners' Motion for Leave to File Sealed Document (Reply) [#110].

### II.   Motion to Certify Class

KB Partners seeks to certify the following proposed class:

> All purchasers of the common stock of Pain Therapeutics, Inc. during the period from December 27, 2010 and June 26, 2011, both dates inclusive (the "Class Period").[1]

Pl.'s Mot. for Cert. [#83], at 2. KB Partners also seeks to have itself appointed as the class

---

[1] Excluding "Defendants, officers and directors of Pain Therapeutics, Inc. members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest."

representative, and lead counsel appointed as class counsel.

## A.      Legal Standards

The Federal Rules of Civil Procedure allow a case to proceed as a class action if the class and the named representative meet the prerequisites of Rule 23(a), and the case is of a type enumerated in Rule 23(b). FED. R. CIV. P. 23(a)–(b). Under Rule 23(a), a class member seeking to sue as a representative of the entire class must demonstrate the following: (1) the class is so numerous joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representatives are typical of those of the class (typicality); and (4) the representatives will fairly and adequately protect the interests of the class (adequacy of representation). FED. R. CIV. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). District courts "must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002) (internal quotation marks omitted).

Assuming the prerequisites of Rule 23(a) are satisfied, in order to proceed as a class action the case must also fall into one of the categories enumerated in Rule 23(b). Relevant here is Rule 23(b)(3). "In order to certify a class under that Rule, a court must find 'that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting FED. R. CIV. P. 23(b)(3)).

The Rule 23(b) predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Id.* To recover on its securities-fraud action in this case, KB Partners must prove:

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013) (internal quotation marks omitted).

The United States Supreme Court has recognized the fourth element, reliance, may be difficult for investors trading on large public markets to prove, and therefore "endorsed the 'fraud-on-the-market' theory, which permits certain Rule 10b–5 plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 241–49 (1988)). The premise at the heart of this theory is that efficient markets incorporate publicly available information into the market price of shares. *Id.* As the *Amgen* Court explained:

> If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price. Furthermore, it is reasonable to presume that most investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information. Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their reliance on the integrity of the price set by the market.

*Id.* at 1192–93.

The fraud-on-the-market theory "has particular significance in securities-fraud class actions," because requiring direct proof of reliance would "ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." *Id.* "The fraud-on-the-market theory, however, facilitates class certification by recognizing

a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Id.* Certification of a class in this case therefore turns largely on whether KB Partners can show the market for PTI shares was generally efficient during the Class Period, thereby allowing KB Partners and its fellow class members to invoke the fraud-on-the-market theory.

## B.    Motion to Amend

Before the Court can consider KB Partners' motion for class certification, the Court must decide which version of the motion to consider. KB Partners filed its original Motion to Certify Class [#83] and Memorandum in Support [#84] on January 22, 2013. Two months later, on March 21, 2013, KB Partners filed an "Unopposed" Motion to Amend its Memorandum in Support [#87], which sought to correct "certain scrivener's errors" in the original memorandum. Pl.'s Mot. to Amend [#87], at 1. PTI immediately objected, arguing the actual amendments were substantive, rather than clerical as represented to PTI by opposing counsel.

As discussed above, one aspect of KB Partners' class certification motion is its contention the market for PTI securities was efficient during the Class Period. To establish market efficiency, KB Partners relies primarily on the testimony of its expert, Frank C. Torchio. Among the many factors Mr. Torchio discussed in his declaration is equity analyst coverage of PTI securities. KB Partners' original memorandum included the following statement on the issue: "According to Capital IQ data, equity analyst coverage of PTIE ranged between 1 and 2 analysts during the Class Period, with an average of approximately 1 analyst, *see* Torchio Exhibit H. *See* Torchio Decl., ¶ 39." Pl.'s Cert. Memo. [#84], at 17. KB Partners now seeks to alter this sentence to change "Capital IQ data" to "Bloomberg," and change the analyst range to "between 1 and 3 analysts . . . with an average of

approximately 2 analysts." Pl.'s Mot. to Amend [#87-2], Ex. 2 (Redlined Memo.).

PTI argues this "eleventh-hour change" fundamentally alters the nature of KB Partners' case, and allowing the change would prejudice PTI. Def.'s Mem. in Opp. [#100], at 1–2. The Court disagrees, and finds the amendments will not prejudice PTI, for a number of reasons. First, Mr. Torchio's declaration, attached to and cited in the memorandum, correctly stated his source as Bloomberg, not Capital IQ, and correctly stated the number of analysts. Pl.'s Cert. Memo [#84], Ex. B (Torchio Decl.), ¶ 41. The memorandum obviously misstated the substance of Mr. Torchio's declaration, and the amendment merely corrects the memorandum to properly reflect the actual data Mr. Torchio used in his analysis.[2] Second, PTI deposed Mr. Torchio on this exact subject, and Mr. Torchio confirmed his declaration properly stated his data and conclusions, and the memorandum was incorrect. Third, because of the parties' generous and repeatedly extended briefing schedule, PTI did not file its response to KB Partners' class certification motion until April 10, 2013. The intervening months provided PTI with more than adequate time to discover the discrepancy, confirm the correct information with Mr. Torchio, and draft its response accordingly. The Court therefore GRANTS KB Partners' Motion to Amend its Memorandum in Support of its Motion for Class Certification [#84].

## C.   Motion to Exclude

The second preliminary dispute to resolve before considering the merits of KB Partners' class certification motion is whether Mr. Torchio's declaration is reliable. PTI has moved to exclude Mr. Torchio's declaration, arguing it is unreliable and therefore inadmissible under Federal Rule of

---

[2] PTI's case would be much stronger if the reverse were true, and Mr. Torchio sought to amend his expert declaration to match the original memorandum. In this case, however, it was clearly counsel's summarization of Mr. Torchio's testimony—not Mr. Torchio's testimony itself—which needed to be changed.

Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). PTI relies

primarily on its own expert, Dr. David I. Tabak, who obviously disagrees with Mr. Torchio's

conclusions and finds his methods unreliable. KB Partners counters the motion to exclude is merely

a battle of competing experts, and the trier of fact can ultimately decide which expert it believes.

1.      **Legal Standard**

The root of the Court's admissibility analysis is Federal Rule of Evidence 702, which

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier
> of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The United States Supreme Court has interpreted this rule as imposing a "gatekeeping role"

upon district court judges, tasking them with "ensuring that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The reliability

prong mandates that expert opinion be grounded in the methods and procedures of science and . . .

be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452,

459 (5th Cir. 2012) (internal quotation marks omitted). "The relevance prong requires the proponent

to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in

issue." *Id.* (internal quotation marks omitted). The burden on the proponent of the expert testimony

is only to prove, by a preponderance of the evidence, the testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The *Daubert* inquiry "'is not intended to serve as a replacement for the adversary system.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting FED. R. EVID. 702 advisory committee's note). "Rather, as *Daubert* makes clear, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.*

## 2.    Application

Tellingly, PTI does not contest Mr. Torchio's qualifications to offer expert testimony in this case. Mr. Torchio has been consulting on matters involving financial and economic analysis, including securities-fraud lawsuits, for more than twenty years. Torchio Decl. ¶ 5. He has testified in numerous trials and arbitrations, and published two articles related to securities litigation in academic legal journals. *Id.* ¶ 7. He holds an advanced degree in economics and finance, and is a Chartered Financial Analyst charterholder. *Id.* ¶ 8.

Essentially conceding Mr. Torchio is a qualified expert, PTI's attack focuses solely on Mr. Torchio's methods and conclusions. Mr. Torchio's declaration purports to establish the market for PTI securities was generally efficient during the Class Period. "[T]he mere fact that a stock trades

on a national exchange does not necessarily indicate that the market for that particular security is efficient." *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005). The Fifth Circuit uses a nonexclusive list of factors in determining whether a stock is traded in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (internal quotation marks and footnote omitted). The reliability inquiry in this case thus requires an examination of Mr. Torchio's approach to each of these eight factors.

**i.     Average Weekly Trading Volume**

"A high weekly stock trading volume suggests the presence of active, informed investors." *Id.* at 324. There is no hard-and-fast benchmark for this criterion.[3] Mr. Torchio opines the average weekly trading volume of shares of PTI stock throughout the Class Period was 2.02 million shares, or 4.60% of outstanding shares, which Mr. Torchio believes to be consistent with an efficient market.

PTI's expert, Dr. Tabak, predictably objects. Many of Dr. Tabak's objections are based on

---

[3] The parties suggest there is a judicially recognized "strong presumption" of efficiency when average weekly trading volume is 2% or more of the outstanding shares, and a "substantial presumption" at 1%. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1293 (D.N.J. 1989). (The Fifth Circuit in *Unger* drew the first five of its factors, including average weekly trading volume, from *Cammer*). But *Cammer*'s discussion of these benchmarks merely quoted a proposal by a commentator; it was not the court's holding in any sense. *Id.* The same commentator suggested establishing a rebuttable presumption of market efficiency for all stocks traded on large public exchanges like the NYSE and NASDAQ, which the court rejected. *Id.* at 1292–93. The *Unger* court based its objection to evidence of a 3.9% or 1.8% average weekly trading volume on the reliability of the underlying data ("two printouts from the Internet"), not the numbers themselves. 401 F.3d at 324.

his belief the Class Period should be analyzed as two halves: the first from December 27, 2010 through March 29, 2011; the second from March 30, 2011 through June 26, 2011. Dr. Tabak chooses March 30, 2011, the date of the first analyst report, as the distinguishing date. Tabak Decl. ¶ 3. Dr. Tabak offers no principled reason why the Class Period should be divided in half, with each half analyzed separately, other than the fact that doing so results in weaker indicia of efficiency during the early class period. Moreover, as Mr. Torchio points out, Dr. Tabak's conclusion—a large PTI stock price reaction to the first analyst report indicates the pre-report market was inefficient—is based on the wrong type of efficiency. Torchio Rebuttal Decl. ¶¶ 45–49. The relevant legal question is whether the market price responds to publicly available information quickly ("informational efficiency"), not whether the market price responds to publicly available information quickly *and accurately* ("fundamental efficiency"). *Id.*; *see also In re PolyMedica Corp. Secs. Litig.*, 432 F.3d 1, 14–16 (1st Cir. 2005) (distinguishing between the two types of efficiency and concluding a stock price need not accurately reflect the fundamental value of the stock in order to establish the fraud-on-the-market presumption).

There is no requirement proposed class periods be analyzed in discrete chunks. While some courts have made reference to data particularly relevant to certain portions of class periods, not even Dr. Tabak has pronounced any principle for determining how and why to segregate individual time periods. The decisions PTI cites involving intra-period divisions are also easily distinguishable.

PTI's primary example involved a five-year class period from March 19, 2001 through March 20, 2006. *In re Northfield Labs., Inc. Secs. Litig.*, 267 F.R.D. 536, 547 (N.D. Ill. 2010). The court drew distinctions between the first three years of the period and the last two, noting analyst coverage was nonexistent for the first three years. *Id.* Similarly, the court faulted the plaintiffs' expert for

calculating an average daily trading volume across the entire period, rather than calculating the number on a monthly or annual basis. *Id.* In each instance, the court cited no authority for the need to draw such arbitrary lines through the class period. In *Cammer*, the court suggested looking to "average weekly trading volume during the class period." 711 F. Supp. at 1286. It did not state the metric as "average weekly trading volume during each month of the class period," nor as each year. The entire point of an *average* volume is to capture both highs and lows and arrive at some middle figure. Nothing identified by the *Northfield* court, or by Dr. Tabak, suggests any scientific basis for rewriting the first *Cammer* factor. Even to the extent long class periods pose special problems, the five-year period in *Northfield* is ten times the length of the Class Period proposed in this case.[4]

Second, in *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005), the Fifth Circuit noted the relevant stock lacked any analyst coverage "for more than a third of the class period." 422 F.3d at 315. But the Fifth Circuit's decision in *Bell* was admittedly based on the plaintiff's complete failure to offer "any arguments or evidence in support of the fraud-on-the-market theory." *Id.* Moreover, the court did not divide the class period into thirds when analyzing any other *Unger* factor, suggesting such divisions are at best a convenient point of attack, not a scientific rule. *See id.* (addressing number of market makers during the *entire* class period, not each third).

Second, Dr. Tabak claims Mr. Torchio's numbers fail to discount for the "double-counting" the *Unger* court recognized can occur on some exchanges. *Unger*, 401 F.3d at 324 (citing a 2001 article co-authored by Mr. Torchio). In response, Mr. Torchio argues his double-counting analysis as reflected in his 2001 article was based on pre-1995 data, whereas new data (including Mr.

---

[4] Arbitrarily dividing any proposed period into enough chunks would defeat any application of the fraud-on-the-market theory. Even stocks traded in generally efficient markets may have individual days in which the *Unger* factors would suggest otherwise.

Torchio's discussions with the Chief Economist of NASDAQ and a working paper by the former Chief Economist of the Securities and Exchange Commission) indicate double-counting is no longer a concern. Torchio Rebuttal Decl. [#107] ¶¶ 69–76.

This dispute is the first of many examples indicating PTI's *Daubert* challenge is little more than one well-paid, interested expert disagreeing with another well-paid, interested expert. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("Expensive experts with complex equations and long computer printouts are highly likely to reach opposite conclusions on efficiency of the market."). Mr. Torchio has valid reasons for believing double-counting is no longer a problem. Dr. Tabak's reasons for believing double-counting is still a problem, though based on older literature, may be valid as well. When the underlying academic literature itself is conflicted, the trier of fact should resolve such disputes, not the Court.

Even if the Court were to fully embrace Dr. Tabak's opinion and split the Class Period in two with separate analyses for each period, and discount each period for double-counting, there would still be sufficient evidence of market efficiency based on average trading volume. Discounting each half of the class period using Mr. Torchio's previously suggested figure of 58%,[5] Dr. Tabak arrives at averages of 0.93% and 2.96% for the first and second halves of the Class Period, respectively. Even those numbers approach or far exceed the 1% and 2% "presumption" levels discussed in *Cammer*, which both experts apparently accept as the proper benchmark.

---

[5] Dr. Tabak suggests discounting by 58%, based on Mr. Torchio's 2001 article cited in *Unger*. Mr. Torchio notes a 2002 paper by Dr. Tabak suggests 54.76% is the appropriate discount rate. Torchio Rebuttal Decl. ¶ 67. Using the 54.76% figure results in an average of more than 1% even for the first half of the Class Period. *Id.* This dispute also illustrates that paid experts will find a way to reach whatever conclusion benefits their paying client the most, and the "battle of the experts" should therefore be left to the trier of fact, who is free to judge the credibility of each hired gun.

ii.     **Number of Analysts**

The number of securities analysts following the company's stock during the class period may offer "persuasive" evidence of market efficiency because those investment professionals make buy or sell recommendations to their investor clients, and thereby help incorporate market information into the market price of the stock. *Cammer*, 711 F. Supp. at 1286. Mr. Torchio opines there were between one and three analysts for PTI's stock during the Class Period, which alone "is not persuasive support" for market efficiency. Torchio Decl. ¶¶ 41–43. By adding media coverage of the company available to the market, Mr. Torchio concludes this factor "modestly supports a finding of an efficient market." *Id.*

Unsurprisingly, Dr. Tabak reaches the opposite conclusion. First, he argues Mr. Torchio's data source, Bloomberg, overstates the amount of "meaningful analyst coverage." Tabak Decl. ¶ 26. Dr. Tabak apparently reaches this conclusion by dividing the Class Period in half, and asserting in wholly conclusory fashion the one analyst following PTI in the early period was a "minor firm"[6] which did not release enough reports to create efficiency. *Id.* Dr. Tabak instead uses a different source, the Institutional Brokers' Estimate System, which found zero analysts in the early period and "only one analyst providing earnings estimates" in the late period. *Id.* Both experts rely on appropriate industry sources for their information. Dr. Tabak's criticism of Mr. Torchio's data is weak at best,[7] and does not suggest Mr. Torchio's methods or data are "unreliable" in the sense *Daubert* was concerned with. *See Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring) (*Daubert*

---

[6] The meaning of this term, and the relevance to this litigation, is unexplained.

[7] Mr. Torchio could level essentially the same criticism against Dr. Tabak's data source, arguing it underestimates rather than overestimates the number of analysts. If disagreement alone indicates unreliability, *Daubert* ought to have simply required all expert evidence to be excluded in every case, as each party can always find an expert to disagree with another expert.

gives judges discretion to exclude "expertise that is *fausse* and science that is junky").

Dr. Tabak also faults Mr. Torchio for assuming this factor is either neutral or favorable to market efficiency, but never against. This is largely a distinction without a difference. The question is whether a market is efficient. The number of analysts either indicates it the market is efficient, or does not indicate the market is efficient. Whether one refers to the latter as "neutral" or as "negative" or as "evidence of *in*efficiency," the same idea is being communicated. Mr. Torchio's opinion is not rendered unreliable on this basis, especially given Mr. Torchio's express admission in his declaration the number of analysts alone *does not support* a finding of efficiency.

### iii.   Market Makers

"The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286–87. Mr. Torchio found "approximately 46 to 50 market makers" for PTI during the Class Period, which Mr. Torchio found indicated an efficient market. Torchio Decl. ¶ 45.

Dr. Tabak objects because, as the Fifth Circuit noted in *Unger*, "the mere number of market makers, without further analysis, has little to do with market efficiency," and Mr. Torchio provides no "further analysis." 401 F.3d at 324. This objection speaks to the proper weight to give to the market maker factor, not the reliability of Mr. Torchio's analysis. *See id.* (holding district court erred "when it did not consider the questionable relevance" of the market maker finding). The Fifth Circuit's discussion of this point in *Unger* was expressly concerned with economic literature questioning the relevance of the market maker inquiry itself, and thus is more of an indictment of the *Cammer* factor than an indication an expert should not be allowed to provide evidence on the

-14-

factor. *See id.* Dr. Tabak's related criticisms concerning the number of institutional investors and short sellers merely reflect disagreements between the two experts, which the trier of fact can resolve.

iv.     **SEC Form S-3 Eligibility**

The ability to file an SEC "Form S-3 Registration Statement" may also show efficiency. *Cammer*, 711 F. Supp. at 1285–87. Mr. Torchio states PTI was eligible to file a Form S-3 during the Class Period. Torchio Decl. ¶¶ 46–50. Dr. Tabak contends the Form S-3 is not persuasive support for a finding of market efficiency because of changes the SEC has made to the requirements for filing the form. Tabak Decl. ¶ 46. This is a mere disagreement with the relevance of a *Cammer* factor approved of by the Fifth Circuit in *Unger*, and says absolutely nothing about the reliability of Mr. Torchio's opinion.

v.     **Empirical Cause-and-Effect**

As the *Cammer* court noted, "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." 711 F. Supp. at 1291; *see also Unger*, 401 F.3d at 324 (this factor "goes to the heart of the 'fraud on the market' theory"). Expert testimony on this issue "may be helpful because of the utility of statistical event analysis for this inquiry." *Unger*, 401 F.3d at 325. Mr. Torchio conducted four cause-and-effect analyses in this case, and found PTI's common stock prices reacted quickly to new material information, thus reflecting an efficient market. Torchio Decl. ¶ 21. Unsurprisingly, Dr. Tabak concluded all four analyses are wholly unreliable.

First, Mr. Torchio created a market model for PTI's common stock to measure the reaction of the stock price to market and industry news. *Id.* ¶¶ 22–24. Mr. Torchio found an "adjusted R-

squared"[8] value of 26.8%, where 10% or more indicates a reasonable reaction. *Id.* Dr. Tabak disagrees, pointing to some academic literature which correlates lower rather than higher R-squared values with efficient markets. Tabak Decl. ¶¶ 49–53. Mr. Torchio responds the literature Dr. Tabak relies on has itself been questioned by more recent literature suggesting both hypotheses may be correct in different circumstances. Torchio Rebuttal Decl. ¶¶ 124–29. The experts disagree, and both have reasons grounded in the underlying sciences for their opinions. Disagreement does not equal unreliability.[9]

Second, Mr. Torchio conducted a test to analyze how quickly new information is incorporated into PTI's stock price. Torchio Decl. ¶ 25. Mr. Torchio concluded PTI's stock price "reacted promptly to the big-news days in the Class Period," which indicates an efficient market. *Id.* ¶ 27. Dr. Tabak challenges each event selected by Mr. Torchio for various reasons, again failing to distinguish between informational efficiency and fundamental efficiency. Dr. Tabak mostly quibbles with how to interpret the results of this study. *See* Tabak Decl. ¶¶ 60–62. Dr. Tabak could have conducted his own study, but did not. The wholly predictable fact he now disagrees with the only studies in the record, which just so happen to have been performed by the opposing expert, does not make Mr. Torchio's analysis unreliable.

Third, Mr. Torchio conducted a regression analysis to find the empirical correlation between

---

[8] The Court does not profess to fully understand the statistical tests and economic models employed by Mr. Torchio. Though the parties do not say as much, they likely do not fully understand the tests, either. The R-squared value discussion provides a typical example, where each side simply points to its expert's declaration and makes conclusory statements about which expert is correct, leaving the Court to decipher the underlying arguments. This is truly the stuff of battling experts, not junk science.

[9] The Court is reminded of the old saying: if all the economists in the world were laid end to end, they still would not reach a conclusion. Alternatively, if all the economists in the world were laid end to end, it would not be a bad idea.

absolute stock returns and daily trading volume. Torchio Decl. ¶¶ 28–31. Mr. Torchio found strong positive relationships between the variables, which he understands to be consistent with an efficient market. *Id.* ¶ 31. Dr. Tabak contends this analysis is unreliable because it did not account for specific days where PTI's stock price moved but there was no new information introduced into the market. Tabak Decl. ¶ 65. This is precisely the kind of flaw to be brought out through vigorous cross-examination and the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596. The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.

Finally, Mr. Torchio conducted an empirical study of the ten days during the Class Period on which PTI's stock price had the largest changes, evaluating the news released on each day to determine if the stock price was reacting to material new information. Torchio Decl. ¶ 32. Mr. Torchio concluded the study provided some support for efficiency, though he noted the results were "not strong." *Id.* ¶ 37. Dr. Tabak claims Mr. Torchio's results fall below the threshold suggested by the academic literature. Tabak Decl. ¶ 67. Mr. Torchio responds the article referenced by Dr. Tabak is "not a litmus test," and notes courts have recognized there are many days on which even large stocks traded on efficient markets experience significant changes in price despite an absence of major news events. Torchio Rebuttal Decl. ¶ 141. Again, Dr. Tabak's objections speak more to the weight to afford to Mr. Torchio's conclusions than the reliability of his methods, and therefore offer no basis for exclusion under *Daubert*.

vi.     **Market Capitalization and Float**

Mr. Torchio provided raw data on both of these factors, but concluded "[t]he size of the Company's market capitalization taken alone is not persuasive support for a finding of market

efficiency." Torchio Decl. ¶ 64. Amusingly, Dr. Tabak finds common ground with Mr. Torchio on this point.[10] Mr. Torchio did not offer any analysis of PTI's float.

vii.     **Bid-Ask Spread**

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. Lower spreads indicate more efficient markets. Mr. Torchio concluded the average bid-ask spread for PTI stock was in the thirty-third percentile of spreads for all NASDAQ firms, meaning roughly two out of every three NASDAQ stocks had higher bid-ask spreads. Torchio Decl. ¶¶ 57–59. Mr. Torchio found this spread indicated an efficient market. *Id.* ¶ 59. Dr. Tabak agrees, but nevertheless faults Mr. Torchio for comparing PTI stock to the entire NASDAQ, rather than dividing the NASDAQ into different listing tiers. Tabak Decl. ¶¶ 72–73. Dr. Tabak cites no authority for dividing the NASDAQ as he suggests, and his personal opinion Mr. Torchio should have conducted his analysis differently does not render Mr. Torchio's analysis unreliable.

viii.     **Conclusion**

The Court concludes Mr. Torchio's declaration is reliable and need not be excluded under *Daubert* and its progeny. It is undisputed Mr. Torchio is a well qualified expert. His analysis is thorough, and his methods are supported by references to academic literature and industry practices. Most of Dr. Tabak's criticisms do not challenge the reliability of Mr. Torchio's declaration, but rather (1) disagree with Mr. Torchio's conclusions; (2) disagree with the significance of factors the Fifth Circuit commands this Court to consider when analyzing the fraud-on-the-market theory; or

---

[10] Apparently Dr. Tabak believes Mr. Torchio is capable of sound analysis, so long as Mr. Torchio's conclusions favor Dr. Tabak's client.

(3) reflect genuine disagreements or inconsistencies within the financial or economic fields of study. Even if some of Dr. Tabak's criticisms are well founded, the Court has no reason to believe Mr. Torchio's analysis fails to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Mindful of "the jury's role as the arbiter of disputes between conflicting opinions," the Court concludes the motion to exclude should be DENIED. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

**D.    Class Certification**

The Court finally turns to the central question: whether KB Partners' proposed class may be certified. First, the Court will consider the four factors embodied in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Amchem*, 521 U.S. at 613. Second, the Court will turn to the two requirements of Rule 23(b)(3): predominance and superiority. *Id.* at 615.

**1.    Numerosity**

The first prerequisite to class certification under Rule 23(a) is the existence of a class "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The numerosity requirement "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981). There is evidence in the record indicating approximately two million shares of PTI common stock were traded on the NASDAQ each week during the Class Period, suggesting a potentially massive class of individual investors. Moreover, PTI does not contest this requirement. Accordingly, the Court finds the numerosity requirement is easily satisfied in this case. *See In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834, at *2 (W.D. Tex. June 11, 2010), *aff'd, appeal dism'd sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012).

-19-

**2.      Commonality**

The commonality requirement demands the presence of "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The class members' claims need not be identical, there must simply "be at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982) (footnote omitted); *see also In re Dell Inc.*, 2010 WL 2371834, at *3. There are a number of common issues in this case, as every class member's allegations of securities fraud arise from the same basic set of facts. PTI does not argue this requirement has not been satisfied, and the Court finds it has. *See In re Dell Inc.*, 2010 WL 2371834, at *3.

**3.      Typicality and Adequacy of Representation**

PTI collapses the final two elements of Rule 23(a) in its response. The typicality requirement places the burden on the lead plaintiff of showing "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The Fifth Circuit has held "the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). The adequacy requirement ensures "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The relevant factors are the "zeal and competence" of counsel[11] and the willingness and ability of the plaintiff to take an active role in controlling the litigation. *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002).

There is no dispute the claims advanced by KB Partners are typical of those asserted by the class. In fact, the claims are identical. KB Partners' "claims are effectively indistinguishable from the rest of the Class Members' claims." *In re Dell Inc.*, 2010 WL 2371834, at *4. There are a number

---

[11] PTI does not contend KB Partners' counsel is inadequate in any way.

of disputes as to whether KB Partners will draw typical defenses from PTI, however. First, PTI argues KB Partners is subject to "the unique defense that its reliance was not justified because of its sophistication, heightened access to information, and extensive diligence." Def.'s Resp. [#103-14], Ex. 14 (Def.'s Class Cert. Opp. Memo.), at 14. Second, PTI contends KB Partners is "subject to the unique and atypical defense of no loss causation." *Id.* at 17. Third, PTI claims KB Partners' principal and general partner, Geoffrey de Sibert, "faces unique credibility problems that threaten to become the focus of the litigation at the expense of the putative class members." *Id.* at 17.

a.      **Reliance and Sophistication**

PTI first argues any reliance by KB Partners on PTI's alleged misrepresentations was not justified because Mr. de Sibert is a sophisticated investor. *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) ("sophistication and expertise" of the lead plaintiff is relevant to the justifiable reliance inquiry). This argument fails to account for Congress's express desire, as indicated in the Private Securities Litigation Reform Act of 1995 (PSLRA), for sophisticated plaintiffs in class action securities cases. *See* 15 U.S.C. § 78u-4(a)(3)(B). The Fifth Circuit has "emphasize[d] that Congress enacted the 'lead plaintiff' provisions of the PSLRA . . . to direct courts to appoint, as lead plaintiff, the *most sophisticated* investor available and willing so to serve in a putative securities class action." *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313 (5th Cir. 2002) (emphasis added). In the judgment of Congress and the Fifth Circuit, KB Partners' sophistication is beneficial. Complex securities cases demand lead plaintiffs who "know more than that they were involved in a bad business deal." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001) (internal quotation marks omitted). Lead plaintiffs must be capable of taking an active role in controlling the litigation, and cannot simply rely exclusively on the knowledge and

advice of legal counsel. *Id.* at 483 & n.18. In general, then, KB Partners' sophistication makes it *more suitable* to serve as lead plaintiff, not less.

Any direct reliance by Mr. de Sibert on PTI's alleged misrepresentations does not necessarily make him atypical. An investor who is aware of a particular company's statement and purchases stock based on that statement meets the most traditional form of reliance. *See Erica P. John Fund, Inc. v. Halliburton Co.*, No. 12-10544, 2013 WL 1809760, at *3 (5th Cir. Apr. 30, 2013). Even in the absence of direct reliance, however, investors may rely on the fraud-on-the-market theory to establish the reliance element. *Id.* KB Partners' allegations clearly invoke the fraud-on-the-market theory, an issue typical of all putative class members and applicable to KB Partners itself. The fact KB Partners' reliance story may be even stronger because it may prove direct reliance does not preclude it from representing less sophisticated investors who lacked the same level of knowledge. To hold otherwise would frustrate Congress's explicit call for sophisticated lead plaintiffs.[12]

PTI argues Mr. de Sibert has a relationship with the CFO of Durect Corporation, one of PTI's partners, and therefore had access to far more information than the typical PTI investor. The record before the Court belies PTI's assertion. Mr. de Sibert testified in his deposition he did not believe he received access to any information through his meetings with Durect executives which other investors did not have. Def.'s Resp. [#103-1], Ex. 1 (de Sibert Depo.), at 44–45. PTI points to no evidence to the contrary. PTI's rank speculation Mr. de Sibert had inside information about PTI does

---

[12] For essentially the same reasons, the Court is unpersuaded by PTI's argument Mr. de Sibert, as a sophisticated investor, knew the risks associated with investing and with the FDA approval process, rendering his reliance unjustified. As this Court has previously held, many of the warnings or disclaimers investors had access to were "merely a boilerplate litany of generally applicable risk factors," and were therefore not meaningful in any real way. *See Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); Order of Sept. 26, 2012 [#68], at 16. Moreover, any warnings placed in public documents were equally available to individual investors, and there is no indication Mr. de Sibert relied on any non-public information in making his investment decision.

not render KB Partners atypical.

PTI also asserts Mr. de Sibert's loss is atypical because he was forced to sell his shares due to a margin call.[13] PTI cites no legal authority indicating selling at a margin call renders a lead plaintiff atypical, and other courts have held it does not. *See LaGrasta v. First Union Secs., Inc.*, No. 2:01-CV-251-FTM29DNF, 2005 WL 1875469, at *6 (M.D. Fla. Aug. 8, 2005); *In re THQ, Inc. Secs. Litig.*, No. 00-1783AHM(EX), 2002 WL 1832145, at *5 (C.D. Cal. Mar. 22, 2002). While PTI's damages may be different because it sold at a different time than some other plaintiffs, such differences are typical in securities-fraud cases and do not render a lead plaintiff atypical. *LaGrasta*, 2005 WL 1875469, at *6.

### b.    No Loss Causation

It is undisputed Mr. de Sibert purchased many of his shares during the last ten days of the Class Period. Citing no authority, PTI claims this fact distinguishes his loss from the losses of other investors, again referencing the margin call. This argument ignores one of the basic elements of the fraud-on-the-market theory, which requires the plaintiff to have "traded the shares between the time the misrepresentations were made and the time the truth was revealed." *Erica P. John Fund, Inc.*, 2013 WL 1809760, at *4. Even if Mr. de Sibert's timing was fortuitous in the sense it occurred shortly before PTI's stock price plummeted, the shares were still purchased within the Class Period, and the losses were still caused by the stock price dropping. Had the stock price not decreased as a result of the REMOXY approval process falling through, a margin call forcing Mr. de Sibert to sell

---

[13] Although PTI references Mr. de Sibert's deposition on this topic, it provides no citations. As the Court is unwilling to read through Mr. de Sibert's entire deposition in search of this evidence, the Court cannot determine whether these assertions are true or not. However, KB Partners does not dispute the underlying facts in its Reply, so the Court will assume PTI's representations are accurate.

his shares would not have resulted in the loss he suffered in this case.

### c.    Credibility

PTI contends Mr. de Sibert is subject to unique credibility problems which threaten to become the focus of the litigation. In particular, PTI makes much of a story from Mr. de Sibert's past when he was a principal at InterCapital Asset Management Ltd. in the United Kingdom. In 1996, the United Kingdom's regulatory body, the Investment Management Regulatory Organisation, banned Mr. de Sibert from working as a money manager in the United Kingdom. Whatever becomes of this rabbit hole, the Court is unconvinced KB Partners is an inadequate class representative solely because one of its principals was reprimanded by an administrative agency in a foreign country nearly twenty years ago. There are no allegations Mr. de Sibert has ever engaged in any misconduct while affiliated with KB Partners.

The Court concludes the requirements of Rule 23(a) are satisfied in this case. Before certifying the class, however, the Court must also analyze the two requirements of Rule 23(b)(3), predominance and superiority.

### 4.    Predominance

The predominance inquiry asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. Rule 23(b)(3). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625. PTI's only argument against predominance relates to the fraud-on-the-market theory. Having determined the Torchio Declaration is admissible, PTI's argument there is no evidence of market efficiency fails. PTI briefly argues, in the alternative, the Torchio Declaration fails to conduct the "rigorous analysis" necessary to invoke

the fraud-on-the-market presumption.[14] The Court notes its protracted discussion of Mr. Torchio's analysis above and concludes Mr. Torchio's declaration provides more than ample evidence to invoke the presumption. Mindful of the Fifth Circuit's admonishment this Court's "determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder," the Court concludes the record at this point contains sufficient facts in favor of an efficient market to invoke the fraud-on-the-market theory and thereby establish predominance. *Unger*, 401 F.3d at 323.

## 5.    Superiority

Rule 23(b)(3)'s second requirement is "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). PTI does not argue a class action is not superior to individual shareholder lawsuits, and the Court finds this requirement easily satisfied. *See In re Dell Inc.*, 2010 WL 2371834, at *4.

### Conclusion

The Court concludes KB Partners has met its burdens under the Federal Rules and relevant case law, and demonstrated a class should be certified in this case. As PTI raised no objections to the language of the proposed class or to the Class Period itself, the Court will certify the class as proposed by KB Partners.

Accordingly,

IT IS ORDERED that the parties' Joint Motions to Extend Time and Page Limits [##80, 85] are GRANTED;

---

[14] On this point, PTI's language is confused. *Unger* directs *the district court* to conduct a "rigorous analysis," not the plaintiff's expert. 401 F.3d at 320. The Fifth Circuit meant to emphasize the real burden placed on district courts in certifying securities-fraud classes. *See, e.g.*, *Unger*, 401 F.3d at 324–25 (vacating the district court's class certification and remanding with instructions to conduct a more "thorough analysis," after which "certification may ultimately prove correct"). This Court is fully satisfied its review of the Torchio Declaration passes muster.

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s Motion for Leave to File Sealed Document (Reply) [#110] is GRANTED;

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s "Unopposed" Motion to File Corrected Memorandum of Law in Support of Motion for Class Certification [#87] is GRANTED;

IT IS FURTHER ORDERED that Defendant Pain Therapeutics, Inc.'s Motion to Exclude Declaration of Frank C. Torchio [#89] is DENIED;

IT IS FURTHER ORDERED that Plaintiff KB Partners I, L.P.'s Motion for Class Certification [#83] is GRANTED;

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 23, the following class is hereby certified: All purchasers of the common stock of Pain Therapeutics, Inc. during the period from December 27, 2010 and June 26, 2011, both dates inclusive (the "Class Period");

IT IS FINALLY ORDERED that Pomerantz Grossman Hufford Dahlstrom & Gross LLP is appointed as class counsel.

SIGNED this the ___3rd___ day of June 2013.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE